In the Matter of the Estate of TERENCE KELLY, Deceased. THOMAS KELLY, Appellant; MAY KELLY, as Administratrix, Respondent.

Executors and administrators — decedent's estate — evidence — application for revocation of letters of administration a special proceeding — when mother, brothers and sisters of decedent prohibited from testifying against alleged widow to whom letters had been issued — testimony based upon information gathered from what witnesses saw decedent do properly excluded as calling for personal transaction with deceased — exclusion of testimony immaterial where it would not have affected result.

1. An application for the revocation of letters of administration is a special proceeding within the meaning of section 347 of the Civil Practice Act prohibiting, upon the hearing upon the merits of a special

proceeding, a party interested in the event from testifying in his own behalf or interest against the executor, administrator or survivor of a deceased person, or a person deriving his title from, through or under a deceased person, concerning a personal transaction or communication between the witness and the deceased person.

2. The mother, brothers and sisters of the intestate herein, who left no children, all have substantial interests in his estate which would be enlarged if it was determined that he died a bachelor and are parties interested in the event of an application for the revocation of letters of administration, theretofore issued to his alleged widow, upon the ground that she was never married to the decedent. They are, therefore, prohibited, under section 347 of the Civil Practice Act, from testifying against the alleged widow who derived her interest, if any, from the decedent.

3. The words " transaction and communication," as used in the statute, embrace every variety of affairs which can form the subject of negotiation, interviews or actions between two persons, and include every method by which one person can derive impressions or information from the conduct, condition or language of another. Testimony, therefore, of the mother and a brother of decedent tending to show and prove that he could not have been any night with the alleged wife, which information was gathered from what they saw or were supposed to have seen the decedent do, was properly excluded, upon objection, as calling for personal transactions with the deceased within the meaning of the statute. (*Holcomb* v. *Holcomb*, 95 N. Y. 316, followed; *Pinney* v. *Orth*, 88 N. Y. 447, limited.)

4. The exclusion of such testimony, in any event, was at most immaterial and a different ruling would not have affected the result, where, if the testimony had been admitted, it would not have been inconsistent with the respondent's testimony that decedent spent some nights each week with her, it being conceded by the brothers and sisters that decedent was not home every night.

*Matter of Kelly*, 206 App. Div. 739, affirmed.

(Argued February 18, 1924; decided April 8, 1924.)

APPEAL, by permission, from an order of the Appellate Division of the Supreme Court in the first judicial department, entered June 1, 1923, which affirmed a decree of the New York County Surrogate's Court denying a motion for the revocation of letters of administration of the estate of Terence Kelly, deceased.

*Frank C. Laughlin, John T. Loughran* and *James A. Delehanty* for appellant. The surrogate excluded proof offered by the appellant· to contradict the testimony of the respondent's relatives that the intestate had frequently slept with the respondent in her mother's home and had regularly dined there. These rulings necessarily denied the appellant a fair opportunity to rebut the respondent's case by showing the very contrary thereof. It is submitted that these rulings are erroneous. (*Pinney* v. *Orth*, 88 N. Y. 447; *Hamlin* v. *Stevens*, 59 App. Div. 522; *Healey* v. *Malcolm*, 99 App. Div. 370; *Cowan* v. *Davenport*, 30 App. Div. 130; *Matter of Eno*, 196 App. Div. 131; *Maverick* v. *Marvel*, 90 N. Y. 656; *Crawford* v. *Haines*, 44 Hun, 597; *McKenna* v. *Bolger*, 37 Hun, 526; *Nay* v. *Curley*, 113 N. Y. 575; *Griswold* v. *Hart*, 205 N. Y. 384.)

*Robert S. Johnstone, Leonard A. Snitkin, Samuel R. Golding* and *Abraham Goodman* for respondent. The issue as to whether Terence Kelly entered into a contract of marriage was an issue with respect to a personal transaction concerning which his relatives were precluded from testifying by section 347 of the Civil Practice Act, the natural tendency of their testimony being to disprove the marriage contract, in the event of which they would increase their distributive shares in the estate. (*Fisk* v. *Holding*, 148 N. Y. Supp. 501; *Holcomb* v. *Holcomb*, 95 N. Y. 316; *Griswold* v. *Hart*, 205 N. Y. 381; *Heyne* v. *Doerfler*, 124 N. Y. 505; *Van Vechten* v. *Van Vechten*, 20 N. Y. Supp. 140; *Richards* v. *Crocker*, 20 N. Y. Supp. 954; *Clift* v. *Moses*, 112 N. Y. 426; *Canpbell* v. *Lewis*, 38 Hun, 306; *Matter of Hiller's Estate*, 91 N. Y. Supp. 378; *Richardson* v. *Emmett*, 170 N. Y. 412; *Wilson* v. *Reynolds*, 31 Hun, 46; 98 N. Y. 640.)

CRANE, J. Upon the petition of May Kelly alleging that she was the widow of Terence Kelly who died in the state and county of New York on the fifth day of November, 1921, the Surrogate's Court of New York

[238 N. Y. 71] Opinion, per Crane, J. [April,

county appointed her by order dated December 16, 1921, the administratrix of the estate of said deceased.

In her petition May Kelly had not only alleged that she was the widow of Terence Kelly but that he had left him surviving a mother, two brothers and three sisters. Thomas Kelly, one of these brothers, on the very day that letters of administration were issued to May Kelly, made his petition to the court asking for the revocation of these letters granted to May Kelly upon the ground that she had falsely and fraudulently represented to the court that she was the widow of the deceased whereas in truth and in fact she was never married to him; that the said Terence Kelly was single at the time of his death. Upon the petition and opposing affidavits, a lengthy hearing was had before the surrogate on which many witnesses were called for both sides and which resulted in a decree of the Surrogate's Court entered on the 10th day of May, 1922, denying Thomas Kelly's application. On the 16th day of May, 1922, this order was amended in a respect not now material. I refer to it for the reason that the appeal was from both orders and the Appellate Division has unanimously affirmed both orders. They can and must be dealt with as one.

The only issue presented to the surrogate for decision upon this application for the revocation of letters of administration was the marriage of May Kelly to Terence Kelly. There had never been a ceremonial marriage between these two parties. May Kelly offered testimony to prove that a common-law marriage had taken place between her and Terence Kelly sometime in January of 1913; that thereafter to the date of his death on the fifth day of November, 1921, they had lived together as man and wife; that he had held her out to the world and acknowledged her before his friends and acquaintances as his wife. The surrogate found as a fact that this common-law marriage had taken place, and that May Kelly was the wife of Terence Kelly. This finding

1924.] Opinion, per CRANE, J. [238 N. Y. 71]

of fact has been unanimously affirmed by the Appellate Division and is conclusive upon us.

We, however, have allowed an appeal to this court in order that we may review more fully and completely than we could upon the motion certain questions of law which arose on the exclusion of evidence. These questions will be stated.

The respondent in the first instance had offered testimony as to the way in which this common-law marriage had come about between her and Terence Kelly. In 1913 she was a young girl living in New York city not far from the home of Terence Kelly. He was fourteen or fifteen years older than she. During the course of their acquaintance and his visits he had taken her out one night in January of 1913 and kept her at a hotel all night. The next day he explained the circumstance to her mother by saying: " He says: ' She is my wife; we have agreed to be married and she is my wife,' he said. I said: ' Your wife? ' He said, ' yes, we have been married.' I said: ' How could you be married? ' He said: ' We have been married; we have made up our minds that we are married, and we are married and we are man and wife.' I said: ' That is no marriage, without a priest.' ' Yes,' he said. He showed me her ring he had given her. He bought her a little diamond ring. I said: ' That is not a wedding ring; why don't you go over to the church and let Father Jordan marry you? ' He said: ' I am going to tell you for the reason at the present time why I cannot,' but he said, afterwards I will." These statements of Terence Kelly were repeated to other members of the respondent's family who testified in detail regarding them. For instance, Frank Neary, a brother of the respondent, testified that after the above incident the deceased said to him: " Don't get excited; there is no use of getting excited; we are married. I said: ' You are married ? ' He said ' Yes ' ' Where did you get married at this time of night? ' He said he did not go

to any minister or no priest, but we are married in the eyes of the Lord, and he said, ' show him the ring, May.' "

Shortly after this, Terence came to the respondent's home for his meals and slept there with her a couple of nights a week. When not with the respondent at her home he was at his mother's home in the neighborhood. Later the decedent opened a new place o business at One Hundred and Twenty-fifth street and Eighth avenue. It was a saloon. At his solicitation May Kelly and her mother, Mrs. Terry, hired a six-room apartment at No. 263 West One Hundred and Twenty-third street. The deceased paid the rent. He bought the respondent her clothes and made her an allowance of from $25 to $35 a week, all of which went to pay for the upkeep of the house. At this place he also slept two or three times a week occupying the same room and bed with the respondent.

I have referred to this branch of the testimony in order to bring out this feature of it. After this couple in 1913 established what has been called their common-law marriage the respondent continued to live with her mother. Kelly spent much of his time with them but he apparently did not sever his connection with his own mother's home. He spent part of his time and nights with May Kelly and part of his time and nights with his own people. It was an important part of the respondent's case, in order to establish the common-law marriage, to prove that she and Kelly had cohabited together as man and wife; that they had lived before the world in that relationship and that he had made his home with her.

It was equally important to the petitioner, appellant, to show that no such relationship existed; to establish that Terence Kelly did not make his home with May Kelly and her mother; that he did not spend his time with them, and that the relationship of man and wife did not exist between them. In a word, May Kelly attempted to prove that she and Terence Kelly lived together as

1924.]            Opinion, per CRANE, J.            [238 N. Y. 71]

man and wife at her home or their home two or three nights a week. The petitioner undertook to prove that Terence Kelly, his brother, lived at his mother's home all the time and never lived with May Kelly. At this point the question arises which we are called upon to review. Could the petitioner establish this fact that Terence Kelly never lived with May Kelly, but lived all the years at home with his mother, by the testimony of interested witnesses? Was such evidence incompetent under section 829 of the Code of Civil Procedure, now section 347 of the Civil Practice Act?

The question arises in this manner. Thomas Kelly, the petitioner, a brother of the deceased, when upon the stand, was asked this question:

" Q. How frequently have you seen your brother each week at the address which you have given [177 West Eighty-third street] * * * " The Surrogate: "Any communication or transaction with his brother is barred if objected to under section 347 of the Surrogate's Court Act."

" Mr. Delehanty: With that ruling — what I propose to offer, if counsel will indicate his, attitude, that will save encumbering the record, is that of a general history of the habits, place of occupation and residence of the deceased Terence Kelly, and I propose to put a series of questions to this witness along that line."

" Mr. Snitkin: To which I shall make objections, and do object to them."

" The Surrogate: Objections being made, of course I am going to rule. Go ahead and ask your questions. Then if it does encumber the record even we will have to do it that way. It is better to get them in."

Objections to the following questions were made and sustained, to which the applicant's counsel took exception:

" Q. During the same period which I have just mentioned, have you seen your brother Terence at the apartment which you speak of during each day? "

" Q. Have you been at 177 West Eighty-third street, and observed whether your brother, Terence Kelly, now deceased, occupied a room or bed in any part of that apartment at any time? "

" Q. Have you been, during the past ten years, in the apartment 177 West Eighty-third street at a time when your brother Terence Kelly was there? "

Margaret Kelly, the mother, was asked this question which was excluded over objection and exception:

" Q. How frequently during the past ten years have you seen your son Terence at the apartment 177 West Eighty-third street, where you say you live? "

These exceptions present certain questions. Does section 829 of the Code of Civil Procedure, now 347 of the Civil Practice Act, apply to an application of this kind?

Administration in case of intestacy must be granted to the persons entitled to take or share in the personal property who are competent and will accept the same in the following order: 1. To the surviving husband or wife. 2. To the children. 3. To the grandchildren. 4. To the father. 5. To the mother. 6. To the brothers. (Surrogate's Court Act, § 118.) In this case, therefore, May Kelly was entitled as a matter of right to letters of administration if she were the wife of Terence Kelly. If she were not the wife of Terence Kelly then the petitioner, Thomas Kelly, a brother of the deceased, was entitled to administer, his mother having renounced in his favor.

Certain other rights were dependent upon these relationships. May Kelly, if she were the wife of Terence Kelly, was entitled under section 98 of the Decedent Estate Law [Cons. Laws, ch. 13] (Art. 3, Descent and Distribution) to a certain portion of the personal property belonging to her husband at the time of his death. There being no children, issue of the marriage, the widow, May Kelly, was entitled to one-half of this personal property, the other half being distributed to the next of kin of the deceased entitled

1924.]				Opinion, per Crane, J.				[238 N. Y. 71]

under the provisions of the section. If it should be that May Kelly was not the wife of Terence Kelly then he died leaving no widow and no children, so that his estate would be distributed between his mother and his brothers and sisters or the representatives of such brothers and sisters. (Decedent Estate Law, sec. 98, subd. 6.)

There can be no question, therefore, about the interest which the mother and the brothers and s sters of Terence Kelly had in this litigation and the issues presented. They would receive a larger proportion of the estate left by the deceased should it be determined that he died a bachelor. May Kelly, the respondent, also had an interest in the litigation and in the issue arising therein. She was entitled to administer if she were the widow, and also entitled to one-half of the estate. The interests of all parties, therefore, were quite substantial. The testimony of the brother and the mother would bear directly against the interest of the widow and might bar her from rights and property. Whatever rights and property she had under the law were dependent upon her relationship to the deceased and were derived out of, from and in consequence of such relationship. Her title and interest were derived from, through and under Terence Kelly. If he died possessed of the property and she were his widow she would be entitled to one-half. If he owned no property or if she were not his widow she would receive nothing.

Turning now to section 347 of the Civil Practice Act we find that under these circumstances the widow, the brother and the mother are prohibited from testifying in a proceeding of this kind, regarding the marriage of Terence Kelly with the alleged widow. " Upon * * * the hearing upon the merits of a special proceeding, a party or a person interested in the event * * * shall not be examined as a witness in his own behalf or interest, * * * against the executor, administrator or survivor of a deceased person * * * or a person deriving his

title or interest from, through or under a deceased person * * * by assignment or otherwise, concerning a personal transaction or communication between the witness and the deceased person."

This application for the revocation of the letters of administration issued to May Kelly is a special proceeding within the meaning of this section. (*Angevine* v. *Angevine*, 48 Barb. 417; *Tilton* v. *Ormsby*, 10 Hun, 7; affd., 70 N. Y. 609; *Sorensen* v. *Sorensen*, 56 Neb. 729.)

The widow, the mother and the brother for the reasons above stated are persons very deeply interested in the event. The brother and the mother were called as witnesses to be examined in their own behalf, and they were called to testify against a person, to wit, the alleged widow deriving her interest if any from the deceased person, Terence Kelly. She had this interest by reason of the statutes above mentioned just as securely as though her interest had come to her through a last will and testament. The interest she gets from the estate of her husband comes as much *from* him under the Statutes of Distribution as it would come *from* him under his will if she were a legatee. We, therefore, determine that this section of the Civil Practice Act applies to a proceeding of this nature and to these parties in interest.

The next point is whether the questions excluded and above quoted called for personal transactions with the deceased. We think they did, and that the surrogate ruled correctly in excluding them. In *Griswold* v. *Hart* (205 N. Y. 384) Chief Judge CULLEN reviewed many of the earlier authorities in this state upon this question and determined that since the *Holcomb Case* (95 N. Y. 316) a much stricter view had been taken regarding the exclusion of the testimony of interested parties than theretofore. While it had been the early rule that a party in interest could testify to conversations between the deceased and a third party which he had overheard and in which he had taken no part, since the *Holcomb* case,

this was no longer the rule and any information received from the deceased or through the deceased from a transaction of any nature could not be testified to by a party in interest. Judge Cullen said: " When the common-law rule which disqualified all interested witnesses from testifying was abolished, this exception to the general abrogation of the rule was enacted. The underlying reason of the exception is plain. While it was deemed wise to receive the testimony of witnesses, however biased by interest in the litigation, leaving their credibility to be determined by the court or jury, it was deemed unwise to allow an interested party to give testimony against the successor in interest of a deceased person relating to matters which the death of the deceased had placed it beyond the power of the adverse party to contradict. In other words, the object was to retain the equality between the parties which otherwise, under the new rule, would have been destroyed by the death of the deceased." (p. 395.)

Further, he said: "A personal communication, within the meaning of the section, was well defined by the Supreme Court in *Price* v. *Price* (33 Hun, 69, 73), as ' any one which the surviving party claims to have received directly or indirectly from the deceased person, and which the deceased person if living could contradict or explain. Nor, in our judgment, is the mode of making the communication by the deceased to the survivor at all controlling.' " (p. 397.)

The *Holcomb* case, upon which so much stress was laid in the *Griswold* case, expanded the word " transaction " beyond any interpretation which it had theretofore received. The issue in that case involved the assignment of a mortgage. The claim was that the deceased assignor was insane at the time of the alleged assignment. Relatives, parties in interest, testified as to the acts of the deceased which the witness had seen and as to his

6

condition both physical and mental which had come
to the notice of the witnesses. It was held that this
description of the deceased's conduct, habits and doings
amounted to transactions about which parties in interest
were prohibited from testifying. This court spoke as
follows: " Transactions and communications embrace
every variety of affairs which can form the subject of
negotiation, interviews or actions between two persons,
and include every method by which one person can
derive impressions or information from the conduct,
condition, or language of another. The statute is a
beneficial one and ought not to be limited or narrowed
by construction." (p. 325.)

Let us apply the rule of the *Holcomb* case to the facts
here. The brother — party in interest — was asked to
state the habits of his deceased brother Terence in refer-
ence to remaining home at night and having his meals at
home. The mother — party in interest — was asked how
frequently she had seen Terence at her apartment, 177
West Eighty-third street, where she lived. The purpose
of these questions was to show and to prove that Terence
could not have been any night with May Kelly, the
alleged wife. The information which these two witnesses
were supposed to have was gathered from what they saw
or were supposed to have seen Terence Kelly do. It
was the same in the *Holcomb* case. The question was
whether Homer Holcomb, the assignor of the bond and
mortgage, was sane. Parties in interest were called to
testify to his acts and conduct as bearing upon this
question. In the one case, the acts and conduct of
Terence Kelly proved his absence from May Kelly's
home. In the other case, the acts and conduct of Homer
Holcomb proved the absence of his intelligence and under-
standing. There should be no difference in the applica-
tion of the rule to the two cases. (See *Fisk* v. *Holding*,
163 App. Div. 85.)

The appellant presses upon our attention the case of

*Pinney* v. *Orth* (88 N. Y. 447) wherein a party in interest was permitted to testify that he was not present at an alleged conversation between the deceased and a third party witness. In the light of the later decisions of this court this case must be confined to its facts. In *Clift* v. *Moses* (112 N. Y. 426) it was said of this *Pinney* case, that " the court confined the range of permissible contradiction within narrow limits, and expressly held that it could not be extended to include testimony by the survivor of what was or was not said between the parties at a conversation sworn to by a witness on the other side, although the evidence was offered to contradict his narration of the transaction." (p. 438.)

The *Pinney* case has no application to the evidence attempted to be offered in this case. There was no testimony given as to what Thomas Kelly or the mother had said or done which the appellant sought to contradict. The testimony offered was affirmative testimony going to show what Terence Kelly, the deceased, had done. It naturally would contradict the respondent's witnesses. On a contested issue all evidence for the respective sides is more or less contradictory.

Assuming, however, for the disposition of this case, that these questions about which I am writing did not call for personal transactions of the deceased, their exclusion was at most immaterial and a different ruling would not have affected the result. It was proved and conceded that Terence Kelly did not remain with May Kelly at her home all the time; at the most he stayed there two or three nights a week. The other nights he was at the home of his mother, brother and sisters. These relatives knew of his acquaintance with May Neary or Kelly as she is now called. His sister, Elizabeth McNamae, testified for the petitioner that she knew of her brother's trip to Saratoga with May Neary, Mrs. Neary, Mr. Walz and others. " Q. Did you know where he was? A. Only this. Last time when he went out on a little

drunk, then my sister Margaret, she says, Where is Terence, and they told me he had not been home for a couple of nights, and they told me to go up to his place, my mother went up, and when she went up there they said he was down on Manhattan Avenue, he had just left, and he has always lived home with his mother.  Q. Always at home?  A. Yes, sir.  Q. Every night?  A. With the exception of sometimes when he would go to the Turkish bath, sometimes he would telephone and say he was going to the Turkish bath."

Thus we see that if the testimony of the mother and brother, that Terence lived home with them and was at home nearly all of the time, had been admitted, it would not have been inconsistent with the respondent's testimony that he spent some nights each week with her.  It was conceded by the brothers and sisters that Terence was not home every night.

For the reasons here stated the order of the Appellate Division must be affirmed, with costs.

HISCOCK, Ch. J., CARDOZO and POUND, JJ., concur; LEHMAN, J., concurs on last ground stated; McLAUGHLIN and ANDREWS, JJ., dissent.

Order affirmed.